Whaley, Judge,
delivered the opinion of the court:
The plaintiff and defendant entered into a contract where-bj? the plaintiff was to install boilers furnished by the defendant in a new power house, remove the laundry machinery from the old laundry building into the new laundry building, and to construct and install a distributive heating system for the old and new buildings on the Army Hospital grounds at Hot Springs, Arkansas. There was a time limit in which the work was to be performed and a liquidated damage clause for every day’s delay after the final date for completion of the work.
The plaintiff commenced work promptly. During the performance of the contract questions arose as to the failure of the defendant to supply the machinery in proper condition for installation and the refusal of the defendant to permit the removal of certain machinery when the plaintiff was ready and prepared to carry out this part of his contract.
In addition to these questions the main contention of the parties, and the one around which this case chiefly revolves, is the question of fact as to which party to the contract is responsible for the presence of water in the part of the distributing heating system between manholes no. 1 and no. 6. The preponderance of the evidence clearly discloses that the plaintiff submitted to the defendant the kind of system which he proposed to construct, and the constructing quartermaster referred the matter to the Quartermaster General of the Army, who gave his unqualified approval to the installation of the system proposed. The evidence discloses the plaintiff constructed this system under the inspection, supervision, and careful scrutiny of the constructing quartermaster and his representatives. It was the obligation of the *659 defendant to construct manhole no. 1 which was located a short distance from the laundry building and below it on the side of a hill. The plaintiff constructed manhole no. 2 and connected it with the drain from manhole no. 1. This connection was made with the knowledge and consent, and under the supervision, approval, and inspection of the defendant’s constructing quartermaster. After the system had been constructed to manhole no. 6 and all drains and connections made, heavy rains set in, so that an accumulation of water gathered on the laundry building floor to the extent of many inches. In the desire to relieve this condition, the constructing quartermaster ordered convict labor to cut a trench from the laundry building to manhole no. 1, which had an opening on the side towards the laundry building for the installation of the heating system from the manhole to the laundry building when the latter was completed.
It is unnecessary to recite the facts in this opinion as the finding of facts made by the court fully and convincingly demonstrate that the direct cause of the water in the conduit from manholes no. 2 to 5 inclusive was the result of the defendant’s act in diverting the impounded water in the laundry building into manhole no. 1, over the protest of the plaintiff at the time. The volume of water was so great the drains in this manhole were unable to take care of it with the result it overflowed into and through the other manholes up to and including manhole no. 5. The facts show the asbestos insulation was soaked and thereby destroyed in its effectiveness only in that portion of the system which was flooded at the time of this inundation from the laundry building. The portion of the system from manhole no. 6 to the officers’ buildings, which had not been subjected to this water, was accepted and the part from manhole no. 1 to the laundry building which was constructed afterwards was accepted. There was no faulty construction of the system and its damaged condition was solely due to the act of the defendant in flooding the system with water from the laundry building.
*660 The facts disclose a light test was made after the flooding by the defendant and the system was intact and in proper alignment.
The subsequent failure of the terra cotta pipes to remain in alignment, and the crumbling of a certain portion, were caused by the failure of the defendant to maintain certain sewer and water pipes in proper condition. The breaking of the sewer and the leaking of these water pipes undermined and threw out of' alignment the system in a particular portion. The plaintiff’s contract did not require supervision over these pipes. The plaintiff cannot be held responsible for the condition of the distributing heating system from manholes no. 2 to no. 5.
The plaintiff contends he was required to cease work in the erection of the boilers in the power house after he had commenced their erection so that the contractor for the building could lay the concrete floor in the boiler room, and that, as a result of this cessation of work, he was put to heavy expense in the removal of his equipment and material and the retention of his skilled mechanics. The plaintiff knew by the very nature of his contract it was subservient to the main contract for the erection of the power house by the general contractor and his contract required him not to impede the work of completion of this building. Crook v. United States, 59 C.Cls., 593; 270 U.S. 4.
Furthermore, the evidence discloses only estimates of loss and the proof is unsatisfactory as to what he should recover, if recovery could be had.
The plaintiff further contends the valves furnished by him were rejected after having been accepted and he was put to extra expense in providing additional valves. The valves which were originally furnished were submitted to the Quartermaster General of the Army and approved by him. The technical objection that they did not have stamped on them the pressure poundage as called for by the specifications was expressty waived when the Quartermaster General gave his approval of the make of valve submitted by plaintiff. Under the contract he could make changes in the specifications and when he approved the valves submitted by the plaintiff it was equivalent to a *661 change in this requirement. The evidence does not satisfactorily establish the amount of extra cost to the plaintiff in making the change in valves.
The Government has filed a counterclaim asserting liquidated damages for delay in completion of the contract within the limitation of time. The history of the delays and the negotiations between the Government and the plaintiff during the execution of the contract and before the contract was annulled, as it appears in the finding of facts, makes it highly inequitable that the claim of liquidated damages should be allowed.
After the defendant had declared the plaintiff in default, it called upon the bonding company to complete the work, which it declined to do, but after the contract had been awarded to another contractor, the Government called upon the bonding company to pay the difference between the balance due the plaintiff and the amount of the bid of the second contractor. Without full knowledge of the events leading up to the declaration by the defendant that the plaintiff was in default, the bonding company paid to the Government the sum of $6,908.00.
The plaintiff now attempts to recover the amount so paid in this suit. The plaintiff never acknowledged liability for this sum, but, on the contrary, has expressly denied responsibility. This is a matter between the Government and the surety company and cannot be maintained in this suit. It is a separate and distinct cause of action to which the plaintiff is in no way a party.
There are certain other items of extra work performed by the plaintiff for which he contends he should be paid, but in each instance the facts show no order in writing, as required by the contract, was issued, and, without such an order in writing in each case, no recovery can be had.
Upon the completion of the contract by the plaintiff, there was a balance due him in the sum of $9,992.00. This amount he is entitled to recover. It is so ordered.
WilliaMS, Judge; Littletoh, Judge; and Greeh, Judge, concur.
Booth, Chief Justice, took no part in the decision of this case on account of illness.